IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**DIANA RADER**,                                  )
                                                  )
         Plaintiff,                )
                                                  )
     v.                               )     2:09cv280
                                                  )     **Electronic Filing**
**CITY OF PITTSBURGH, DETECTIVE** )
**J. R. SMITH, DETECTIVE SCOTT**     )
**EVANS, DETECTIVE TERRY**            )
**HEDIGER**,                               )
                                                  )
         Defendants.            )

## OPINION

Plaintiff commenced this § 1983 civil rights action seeking redress for the alleged

violation of her Fourth and Fourteenth Amendment rights in conjunction with her 2007 arrest for

the 1986 murder of her husband.  Presently before the court is Detectives J. R. Smith and Scott

Evans' motion for summary judgment.  For the reasons set forth below, the motion will be

granted.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted

if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Summary judgment

may be granted against a party who fails to adduce facts sufficient to establish the existence of

any element essential to that party's claim, and upon which that party will bear the burden of

proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact.  When the movant does not bear the burden of proof on the claim, the movant's initial

burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992).  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below.  On February 15, 1986, Raymond Marzoch ("Marzoch") was found dead shortly after 3:00 p.m. on the third floor of the Kaufman's parking garage along Cherry Way and Forbes Avenue in Pittsburgh, Pennsylvania.  Marzoch was sitting in the driver's seat of his vehicle.  He had been shot at close range in the right temple.  The bullet exited the left side of his head, shattered the driver's side window and was recovered approximately twenty feet from the car. Lab analysis indicated that the rifling characteristics on the bullet were similar to those fired from a Smith & Wesson .38 or .357 caliber firearm. There was no sign of forced entry into the car.  The glove box was open.

Marzoch owned both a .38 and a .357 Smith & Wesson handgun.  He was known to keep the .38 in the glove box of his car.

Marzoch's wallet was discovered sitting on top of a pole near the Oxford Center loading dock on Third Avenue.  It had his identification in it but no cash.  Several hundred dollars were found in Marzoch's pants pocket.

Chuck Johnson went to the garage around 3:00 p.m.  He went to the third floor and saw a black Saab pulling out.  The black Saab had a white male and female in it.  The female had dark hair, medium length, possibly in a bun.  They were both turned around and looking out the back window as they were backing up.  Johnson waited until the Saab left, and then parked in the open spot.  After getting out he noticed Marzoch in his car which was facing the space where Johnson had parked (and one space over to the left).  Marzoch was bleeding profusely.  Johnson went to the Deli and told the counter attendant to call 911.

3

At approximately 3:01 p.m. a parking garage attendant was informed by a patron that someone was injured on the third floor.  At 3:08 p.m. 911 received a call reporting an injured person.

Marzoch worked as a corrections officer at SCI Pittsburgh.  Co-workers informed the investigating authorities that Marzoch shared the details of his personal life regularly and he had a turbulent marriage to his wife Diana Marzoch (n/k/a Diana Rader).  They had been married, divorced in 1982 and then re-married in 1983.  He told his co-workers about his suspicions that she had been seeing other men and taking his overtime pay that he had hidden, as well as his fear that she would do him harm.  Co-worker William Miller was told by Marzoch that "[i]f I ever turn up dead, my wife did it."

 On the day of his death, Marzoch worked his regular shift of 6 a.m. to 2 p.m.  Co-workers who worked with him relayed that he was happy that day because he had plans to meet his wife right after work at the Kaufman's garage so they could go to dinner.  He thought this was a sign that things were improving in their relationship.  He received a telephone call at work and remarked that "it must be my wife calling to make sure that I remember to meet her at Kaufmann's after work."  The call turned out to be from a co-worker asking for a ride to work the next day.

Anna Sonkin (nee Wojzynski) entered the Kaufmann's garage after 2:00 p.m. that day with her mother.  They parked right in front of the victim's car.  In 1986 she told investigators that when she got out of the car she observed a white male and white female in Marzoch's car; the white male was in the driver's seat and a white female was in the back seat on the passenger's side.  The male smiled at her as she walked by around 2:20 p.m.  The female appeared to be 35 to 37 years of age.  Hennigan Supplemental Report (Doc. No. 58-11) at 2.

Shortly after the shooting Sonkin worked with a composite sketch artist to develop a picture of the woman she saw in the vehicle.  She also was shown a photo array of seven women as part of the 1986 investigation.  She picked plaintiff (number 2) and Teri Epolito (plaintiff's daughter - number 7, who bears a strong resemblance to plaintiff), as the two women that looked similar to the woman she saw in the car.  She was unable to make a positive identification.  Sonkin also participated in a line-up identification. She viewed plaintiff, her daughter and six similar-looking women.  Sonkin again was unable to pick anyone positively.

Plaintiff was interviewed as to her whereabouts on the day in question.  She reported that she was home until about 12:30 p.m., left and went to a nearby spa (the Spa Lady) for about an hour and returned home at approximately 2:30 p.m.  She then took her ten year old son, Jon, and the two Toth boys Michael and Eric (ages 8 and 10) to Giant Eagle to cash a check, to Cost Cutter's where Jon got a haircut, to Wendy's and then to K-Mart before returning home.

Plaintiff's account was corroborated by interviews with Michael and Eric Toth and Mrs. Toth.  The boys indicated that they stayed at the Marzoch's on Friday night.  Plaintiff got up around 11:00 a.m. and showered.  She said she was going to the spa.  Jon asked to go to Wendy's later in the day.  Plaintiff said she would take them after she got back from the spa.  Plaintiff left at about 12:30 to go to the spa and was gone for about two hours.  The Toth boys went home and asked to go to Wendy's with plaintiff.  Mrs. Toth said okay and gave them money.  This was just after the movie "My Bloody Valentine" aired on the USA Network, which ran from 12:00 p.m. to 2:00 p.m.  The boys went back to the Marzoch's after getting their money and plaintiff arrived home approximately 20 minutes later.  Plaintiff took them to Giant Eagle, Cost Cutters, Wendy's and K-Mart.  Plaintiff then dropped the Toth boys at home.  Mrs. Toth indicated the boys left for the Marzoch's "a little after 2:00 p.m."

Christi Marzoch, plaintiff's then 16 year-old daughter, was with her boyfriend on February 15, 1986.  They were driving near Giant Eagle.  She reported seeing plaintiff and the boys in the parking lot somewhere between 3:00 and 4:00 p.m.  They just drove by and she did not have any contact with her mother at that time.

Plaintiff had advised the detectives that she had forgotten her membership card to the spa.  She reported having signed in on a sign-in sheet.  The original investigation file contained a note that plaintiff had signed the sign-in sheet on that Saturday.

On March 1, 1986, an anonymous person called the homicide division of the Pittsburgh police and advised that he had witnessed the shooting of the guard in the Kaufmann's garage.  He saw a woman in the car, and she was crying.

There was no parking ticket in Marzoch's car or on him.  Subsequent investigation of the issued parking tickets revealed that one ticket was missing out of the vehicles that entered the garage between 1:41 p.m. and 3:00 p.m.  That ticket was number 087-061; numbers 087-060 and 087-62 both had punch in times of 3:00 p.m.

No one was arrested for Marzoch's murder in 1986.  The officers involved in the investigation believed that the identification was not sufficient and they did not "have enough probable cause."

In 2005 the Marzoch murder investigation was reopened.  In December of 2005 Detective Smith made arrangements with Sonkin and traveled to New Jersey to interview her.  He reviewed with her the report from her original statement by reading it aloud.  According to Smith, he did not mention or suggest that plaintiff was the subject of the investigation but he believed that Sonkin understood this from information and events that occurred in 1986.  After reviewing the report and the photo array compiled in 1986, Smith asked Sonkin if she

remembered anyone in the photo array and Sonkin remembered identifying numbers 7 (Epolito) and 2 (plaintiff) as the women that most closely resembled the woman she saw in Marzoch's car. Smith asked if there was anything else she could remember, anything that was not written down or missed. He also asked if she remembered anything about the age of the woman she saw. Sonkin replied that the woman was much older than her. Sonkin was 26 at the time. Epolito was 24; plaintiff was 41. Smith took this to mean that Sonkin had narrowed down the photo array to one person: plaintiff.

Smith and the other detectives also believed the 2005 investigation uncovered additional information or at least new areas of focus on existing information. These included that plaintiff said she did not own a gun in 1986. It was learned at some point after her statement that a .22 caliber pistol was registered in her name and she was known to carry a handgun in her pursue. Other nuances included that Christi Marzoch reported seeing her mother at "3:05" p.m. on that Saturday, which was much more specific than the "between 3:00 and 4:00 p.m." she reported in 1986, which led the interviewing detective to believe that the revised account was "rehearsed." Also, a review of the information available about the spa revealed that in 1986 when a member came in without his or her card, they would be required to fill out a form that then required them to show their membership card on their next visit. There was no record of anyone filing out the required form on that Saturday.

Following the review of the investigation in 2005, the detectives turned over their entire investigative file to Deputy District Attorney Diane Berman ("DDA Berman").[1] DDA Berman then filed a Notice of Submission to the March 2006 Allegheny County Investigating Grand Jury

---

[1] This same file was turned over to plaintiff's counsel during discovery. Nothing was withheld in either production.

in an effort to obtain a grand jury presentment.[2]  The notice requested the tools of the grand jury to further investigate the Marzoch murder.  On April 4, 2006, the notice was reviewed and approved by the supervising judge of the March 2006 investigating grand jury.

DDA Berman had unfettered discretion in deciding what to present to the grand jury.  At her direction various witnesses were presented.  Those witnesses included the investigating detective defendants, Sonkin, Marzoch's brother (Jerome Marzoch), an individual familiar with the financial benefits that accrued to plaintiff on Marzoch's death and so forth.  A significant amount but not all of information from the 1986 reports and statements was presented.

The defendant detectives prepared and DDA Berman presented a timeline to be used as a "guide" for the grand jury's consideration.  Among other things, the created timeline did not reference the following:

1) the missing parking ticket evidence, which indicated that a vehicle entered at 3:00 p.m. but did not leave on that Saturday (at least with the same ticket);

2) the statement of Johnson, who saw the black Saab leaving the area at 3:00 p.m.;

3) the statement of Mrs. Toth that the boys left for plaintiff's house a little after 2:00 p.m. Instead, it indicated without explanation that the Toth boys left at 2:15 p.m.; and

4) Sonkin's statement that she saw Marzoch at 2:20 p.m. and he was alive and smiling. Instead, it indicated that Denise Daley saw Marzoch at 2:20 p.m. and did not know if he was alive or dead.

---

[2] An investigating grand jury is convened pursuant to the Investigating Grand Jury Act, 42 Pa. C. S. § 4541, *et seq.*  The Commonwealth may use an investigating grand jury even through no new evidence will be produced in a general sense, where the information to be derived from the same evidence and witnesses will be quantitatively and qualitatively superior, and thus enable a prima facie case to be established which might not occur otherwise. <u>Commonwealth v. Desabetino</u>, 535 A.2d 169, 172 (Pa. Super. 1987).

On November 30, 2006, the investigating grand jury returned a presentment containing 8 pages of findings followed by a conclusion "that there is probable cause to believe that on or about February 15, 1986, Diana Marzoch Rader, intentionally, knowingly, recklessly, or negligently caused the death of Raymond Marzoch by a gunshot wound to the head." It recommended that the district attorney file a criminal complaint pursuant to the investigating grand jury's authority at 42 Pa. C. S. § 4541(e) charging plaintiff with criminal homicide in violation of 18 Pa. C. S. § 2501.

On March 7, 2007, Supervising Judge John Zotolla of the Court of Common Pleas of Allegheny County reviewed the investigating grand jury's presentment and a criminal complaint and affidavit of probable cause prepared in conjunction therewith, found them to be in proper form in accordance with the law and approved the issuance of a warrant for plaintiff's arrest. Plaintiff was arrested pursuant to the warrant on that day.

A preliminary hearing was held before Judge Lawrence O'Toole on April 17, 2007. After the hearing Judge O'Toole dismissed the charge(s) on the ground that the Commonwealth "failed to prove a prima facie case." Plaintiff filed the instant action on March 4, 2009.

Defendants maintain that they are entitled to summary judgment because there is no evidence that they misrepresented, withheld or omitted any evidence from their investigation from consideration by the grand jury. They note that DDA Berman was in charge of presenting the information to the grand jury and she used her prosecutorial discretion in deciding what and how to present the information from the investigatory file. They turned over their entire file and merely testified as witnesses. Their testimony was presented in question and answer format and they were not permitted to testify freely about the investigation. They answered all questions truthfully and completely. The investigating grand jury issued a presentment, which called for a

9

warrant and affidavit of probable cause, all of which was approved by a judge.  This process assertedly enjoys a presumption that it was duly and properly utilized and plaintiff has presented no evidence of misconduct.  Defendants thus contend that plaintiff cannot show that they violated her rights in any way.

Plaintiff argues that defendants violated her rights by using coercive and misleading tactics in obtaining the 2006 identification from Sonkin.  They also omitted critical exculpatory information in the timeline that corroborated the timing of Marzoch's murder and plaintiff's account of her whereabouts, which in combination established that plaintiff could not have shot her husband.  The grand jury heard about the 2005 Sonkin identification and the distorted timeline was presented to and used by the grand jury.  Thus, plaintiff maintains that defendants misled the prosecutor and the courts in meaningful ways and are not sheltered from § 1983 liability.

In general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right.[3]  Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  A cause of action under § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege or immunity secured by the constitution and laws of the United States (2) that was committed by a person acting under color of state law.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997); Berg v. Cty. of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) ("The Plaintiff must

---

[3] Section 1983 creates liability  against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.

demonstrate that a person acting under color of law deprived him of a federal right." ) (citing Groman, 47 F.3d at 633).

Here, it cannot be disputed that the defendant detectives acted under color of law.  Thus, this element is not in dispute.

Second, "the exact contours of the underlying right said to have been violated" must be determined.  Berg, 219 F.3d at 268 (citing City of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5 (1998)).  Plaintiff alleges that she was subjected to arrest and prosecution based upon false, misleading, and/or the omission of evidence in violation of the Fourth and Fourteenth Amendments.

The Fourth Amendment prohibits an arrest of a citizen except upon probable cause. Rogers v. Powell, 120 F.3d 446, 452 (3d Cir. 1997) (citing Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995) (citing Papachristou v. City of Jacksonville, 405 U.S. 156 (1972)). "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  Rogers, 120 F.3d at 453 (citing Orsatti, 71 F.3d at 483).  The elements of false arrest include: 1) an arrest made without probable cause or 2) one made by someone without privilege to arrest.  Brockington v. City of Philadelphia, 354 F. Supp.2d 563, 572 (E.D. Pa. 2005) (citing Patzig v. O'Neil, 577 F.2d 841, 848 (3d Cir.1978) and Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir.1998)).

In order to proceed with a § 1983 malicious prosecution claim a plaintiff must be able to satisfy the common law elements of a malicious prosecution claim.  Merkle v. Upper Dublin School District, 211 F.3d 782, 792 (3d Cir. 2000).  These are: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding

was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice." Id. (citing Hilfirty v. Shipman, 91 F.3d 573, 579 (3d Cir.1996)).  The constitutional component of the claim also requires a showing of a loss of liberty beyond simply showing an unlawful arrest.  Id. (citing Gallo v. City of Philadelphia, 161 F.3d 217, 225 (3d Cir.1998)); accord McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d Cir. 2009) (malicious prosecution claim premised on a violation of the Fourth Amendment includes as an element a showing that "(5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.") (citing Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir.2003)).

To the extent defendants maintain that they cannot be found liable because formal legal process resulted in the issuance of a warrant for plaintiff's arrest, the proposition is misplaced.  It is well settled that "an arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest."  Wilson v. Russo, 212 F.3d 781, 786 (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir.1997)).

A plaintiff seeking to overcome a judicial determination of probable cause leading to an arrest made pursuant to a warrant must have sufficient information to prove "by a preponderance of the evidence: (1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'"  Id.  Thus, a claim that a warrant was based on false assertions and misleading omissions requires a determination of whether the defendant made the alleged assertions or omissions either deliberately or with reckless disregard for their truth.  Reedy v. Evanson, 615 F.3d 197, 213 (3d Cir. 2010).

Something is done deliberately when it is done intentionally after consideration. Assertions are made with reckless disregard when after viewing all the evidence the finder of fact can conclude that the officer "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Id. (quoting Wilson, 212 F.3d at 788).  Even minor details must be held to this rigorous assessment because "recklessness is measured not by the relevance of the information, but the demonstration of willingness to affirmatively distort the truth." Id.  "'Omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know' in making a probable cause determination." Id. (quoting Wilson, 212 F.3d at 783).

If the plaintiff succeeds in producing sufficient evidence of omissions and/or false assertions made knowingly or with reckless disregard for the truth, then the analysis proceeds to a determination of whether the omissions and/or assertions "were material, or necessary, to the finding of probable cause." Id.  Materiality in this regard is determined by excising the offending inaccuracies and inserting the facts recklessly omitted and then assessing whether the corrected submissions as a whole would establish probable cause.  Id.

Throughout the analysis care must be taken to interpret the record in the light most favorable to the non-moving party and draw all reasonable inferences therefrom in its favor. Id. at 216.  Careful application of these principles "ensures that a police officer does not 'make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.'" Id. at 213 (quoting Wilson, 212 F.3d at 787).  In this regard "an officer contemplating an arrest is not

free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." Id. (quoting Wilson, 212 F.3d at 790).

Plaintiff has failed to produce any evidence that defendants deliberately or with reckless disregard for the truth withheld or omitted any information from the grand jury's consideration. It is undisputed that all information from the police investigation was turned over to DDA Berman who exercised independent prosecutorial discretion in deciding the manner and means by which that information was to be presented to the grand jury. Defendants only provided testimony about the investigation through a question and answer format and were not permitted to testify freely about the investigation. Each defendant responded to plaintiff's counsel's questions about his testimony before the grand jury but was unable to testify about the specifics of what other additional information was presented to the grand jury. Thus, plaintiff cannot prove that either officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for a warrant" for plaintiff's arrest.

Plaintiff's efforts to overcome this shortcoming are unavailing on several levels. First, there is no evidence to suggest the grand jury's return of the presentment or Judge Zotolla's issuance of the warrant was affected by Smith's questioning of Sonkin in 2005. Sonkin testified before the grand jury and the presentment contained findings of fact based on her testimony that clearly revealed that the grand jury was well aware that in April of 1986 Sonkin had selected photos of Epolito and plaintiff as most closely resembling the woman she saw in Marzoch's car, but she could not make a positive identification; that she (Sonkin) could not make a positive identification from a lineup of eight women that included Epolito and plaintiff in March of 1987; and Sonkin again examined the "photos taken of the 1987 lineup and told members of the grand

14

jury that #2 (Marzoch) and #6 (Epolito) most closely resembled the female passenger she had seen."  Grand Jury Presentment (Doc. No. 43-1) at 6-7.

Against this backdrop there is simply no probative force to plaintiff's contention that Smith's testimony that Sonkin had narrowed her identification to plaintiff based on age had any influence on the grand jury's findings and/or the issuance of the warrant by Judge Zotolla. Sonkin had described the woman as 35 to 37 years of age in 1986; Sonkin was 26 years of age and plaintiff was 41 years of age then.  The age difference between plaintiff and Sonkin was not a new revelation.  Furthermore, the grand jury based its assessment on the fact that Sonkin repeatedly identified Epolito and plaintiff as the individuals that most closely resembled the woman she saw in the car but she was unable to make a positive identification beyond that determination.  To suggest that Smith's testimony that Sonkin's 2005 statement about the age of the woman had some secretive effect on the grand jury's findings and/or the judge's issuance of the warrant defies logic and is speculative at best.

Plaintiff's argument premised on the fact that "the means by which Sonkin's identification was secured was never disclosed in the state proceedings" is misplaced for the same reasons. The presentment demonstrates that nothing about the uncertainty that kept Sonkin from making a positive identification was withheld from the grand jury.  Nor is there any basis to assume that Smith deliberately or with reckless disregard withheld or omitted information about his questioning of Sonkin in 2005.  His deposition testimony did not establish that the questioning he employed was highly suggestive or likely to lead to a misleading identification, see Doc. No. 63-6 at 2-4, and there is no basis in the record to suggest or assume that he intentionally or recklessly omitted information about his interview and the questions he asked therein when he testified before the grand jury.  Plaintiff's attempt to argue otherwise is speculative at best and

contrary the leeway the law permits officers to employ in evaluating the reliability of eye witness identifications.  See Wilson, 212 F.3d at 790 n.7 (officers are entitled to re-evaluate, re-assess and seek to corroborate or disprove the likely accuracy of the information given in an eye-witness identification where the surrounding circumstance would lead a prudent officer to do so).

Plaintiff's contentions about the timeline likewise fail to establish the existence of a material issue of fact under the controlling standards.  First, there is no basis to assume that simply because a piece of evidence or information gained in the investigation was not included on the timeline it necessarily was withheld or omitted from the grand jury's consideration.  To the contrary, the hand written note on the timeline and the general principles governing DDA Berman's professional work significantly undermine any such assumption.[4]  Further, it is readily apparent that the timeline was not devised to show when every piece of information was obtained during the course of the investigation and the notion that it conveyed that impression by highlighting some of the evidence is not logical.

Second, plaintiff's suggestion that various pieces of information or evidence directly contradicted or undermined the information in the timeline in a way that made it misleading is not support by the record.  The contention that the "missing parking ticket evidence" and/or the observation of Johnson seeing the black Saab leave the Third Floor at 3:00 p.m. established that Marzoch was shot at 3:00 p.m. is only one of a great number of other inferences that could be drawn from these pieces of evidence – any number of which could raise an inference that the shooting did not occur precisely at 3:00 p.m.  See Deposition of Terry Hediger (Doc. No. 63-5) at 2-4; Deposition of J. R. Smith (Doc. No. 63-6) at 7.  Officers are entitled to draw reasonable

---

[4] The handwritten notation referenced Sonkin's statement in 1986 that she saw Marzoch and the female at approximately 2:20 p.m. and Marzoch was alive at that time.  The detective did not add the handwritten note to the timeline and did not know who did.

inferences from the facts and circumstances available in light of their knowledge about the type

of crime under investigation and prior experience.  See Terry v. Ohio, 392 U.S. 1, 27 (1968) (an

officer may draw specific reasonable inferences from the facts and circumstances in light of his

experience); United States v. Ortiz, 422 U.S. 891, 897 (1975) ("In addition, as we note today in

United States v. Brignoni-Ponce, 422 U.S., at 884-885, 95 S.Ct., at 2582, the officers are entitled

to draw reasonable inferences from these facts in light of their knowledge of the area and their

prior experience with aliens and smugglers."); Ornelas v. United States, 517 U.S. 690, 700

(1996) ("In a similar vein, our cases have recognized that a police officer may draw inferences

based on his own experience in deciding whether probable cause exists.").  Of course, this

principle extends to an officer providing information to a judge or judicial body in order to

obtain a warrant.  United States v. Yusuf, 461 F.3d 374, 389 (3d Cir. 2006) ("The probable cause

determination is to be made only after considering the totality of the circumstances, which

requires courts to consider the cumulative weight of the information set forth by the investigating

officer in connection with reasonable inferences that the officer is permitted to make based upon

the officer's specialized training and experiences.") (citing United States v. Arvizu, 534 U.S. 266,

275 (2002)).  Given this backdrop and the inherent ambiguity in these pieces of evidence, the

"absent information" highlighted by plaintiff is at the very least not "plainly exculpatory

evidence."  Compare Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (noting that under the

totality of the circumstances test an officer is not free to disregard "plainly exculpatory evidence"

where the inculpatory evidence standing alone would establish probable cause and observing in

support that "an officer may make an arrest if a credible eyewitness claims to have seen the

suspect commit the crime, see United States v. Easter, 552 F.2d 230, 233-34 (8th Cir.), cert.

denied, 434 U.S. 844, 98 S. Ct. 145, 54 L.Ed.2d 109 (1977), but the officer may not arrest the

17

suspect if, in addition, the officer is aware of DNA evidence and a videotaped account of the crime that conclusively establish the suspect's innocence.  See, e.g., Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1257 (10th Cir.1998) (no probable cause to arrest plaintiff for shoplifting despite security guards' informing police that plaintiff stole merchandise, where officers viewed videotape rebutting guards' account and where plaintiff explained her actions to officers and produced receipts for the merchandise in question.")").

Plaintiff's assertion about the failure to account accurately for the statement of Mrs. Toth likewise is sufficiently undermined by the record.  Mrs. Toth said in 1986 that the boys left for the Marzoch's "a little after 2:00 p.m."  The timeline placed this event at "2:15 p.m."  A little after 2:00 p.m. is open to some variation and it is difficult to understand how this construction of Mrs. Toth's statement was or could be a basis for a finding that defendants exhibited a "willingness to affirmatively distort the truth."

Plaintiff's dissatisfaction with the failure of the timeline to reference Sonkin's statement that she saw Marzoch at approximately 2:20 p.m. and he was still alive is yet another effort that falls short of the mark.  Sonkin testified before the grand jury and while she reported in 1986 that she saw Marzoch at approximately 2:20 p.m., the grand jury's findings indicate her testimony was to the effect that it was between 2:00 p.m. and 2:30 p.m. when she and her mother entered the garage to park and go shopping.  At that time she saw Marzoch alive in the front and the female in the rear passenger seat.  A handwritten note on the timeline raises the inference that her 1986 recollection that this occurred at approximately 2:20 p.m. was drawn to the attention of the grand jury and plaintiff has failed to advance any evidence to support a finding that the grand jury was not made aware of Sonkin's 1986 recollection through separate submissions or

18

testimony.  To assume otherwise against the above backdrop is conjecture.   This information is at the very least incapable of being "plainly exculpatory evidence."

Plaintiff's attempt to nitpick about the information in the timeline fails to pay proper accord to the deferential standard by which allegations challenging the sufficiency of the information placed before a reviewing judge or grand jury is to be reviewed.  Probable cause exists for an arrest warrant where the totality of the facts and circumstances presented to the judicial officer provide a sufficient basis to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.  Merkle v. Upper Dublin School Dist., 211 F.3d 782, 788 (3d Cir. 2000) (citing Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir.1995).  The question of probable cause in a civil rights case generally is reserved for the jury.  Id. (citing Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir.1998)).  Nevertheless, a court may "conclude 'that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding,' and may enter summary judgment accordingly."  Id.  (citing Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir.1997)).

Clearly, reasonable minds can differ about whether the Commonwealth's evidence was sufficient to proceed with an arrest and/or prosecution.  But a § 1983 claim for false arrest requires misconduct that can be found to have corrupted the probable cause determination and/or the decision to charge and prosecute.

Where a plaintiff challenges the probable cause determination based on false statements or misleading omissions being used in applying for a warrant, and succeeds in supplying adequate proof to permit a finding that such falsehoods and/or omissions were created, then the analysis proceeds to a determination of whether the omissions and/or assertions were material to the

19

finding of probable cause.   Under this prong of the analysis the offending inaccuracies must be removed and the facts recklessly omitted must be inserted, and then the corrected submissions must be reviewed as a whole to determine whether they were material to the finding of probable cause.

Plaintiff has failed to submit sufficient evidence to support a finding that the highlighted pieces of evidence not included in the timeline were material to Judge Zotolla's finding of probable cause.  The challenged timeline highlighted points in time pertaining to plaintiff's reported whereabouts between 2:15 and 5:00 p.m.  Marzoch Investigation Time Line (Doc. 58-13) at 2.  It was referenced in the grand jury's presentment in conjunction with its review of witnesses' statements who saw plaintiff at various times throughout the day.  Presentment at 8. The timeline noted that the actual 911 call reporting that Marzoch had been shot came in at 3:08 p.m.  It is also clear that the grand jury understood that Marzoch was discovered shortly after 3:00 p.m.  Presentment at 2.  The grand jury was aware of the various statements of the witnesses who saw plaintiff throughout the day and "concluded that there is no corroborative evidence that supports her contention that she was at a spa in Olympia Shopping Center or with her son and his friends between the hours of 2:00 p.m. and 3:00 p.m., the critical time during which Raymond Marzoch was killed."  Id. at 9.  The "missing" pieces of evidence referenced by plaintiff  do not supply additional information that directly contradicts the grand jury's consideration of plaintiff's whereabouts between 2:00 p.m. and 3:00 p.m., nor do they reflect evidence that makes the referenced information and the grand jury's assessment of it subject to disbelief for want of reliability.  Given that the grand jury was aware (1) that Marzoch was discovered between 3:00 p.m. and 3:08 p.m., (2) the Toth boys left for the Marzoch's shortly after 2:00 p.m., and (3) Sonkin's testimony about her recollection of seeing Marzoch that day between 2:00 p.m. and

2:30 p.m., plaintiff has failed to submit sufficient evidence to support the proposition that the

inclusion of the additional pieces of information on the timeline would have changed the

probable cause determination set forth in the presentment and effectuated by Judge Zotolla.

Plaintiff has failed to proffer sufficient evidence to meet the elements of her § 1983 claim

for violation of her Fourth Amendment rights.[5]  Accordingly, the remaining defendants' motion

---

[5] Plaintiff's claim based on the Fourteenth Amendment fails for the same reason.
The Supreme Court has opined:

> [w]here a particular Amendment "provides an explicit textual source of
> constitutional protection" against a particular sort of government behavior, "that
> Amendment, not the more generalized notion of 'substantive due process,' must
> be the guide for analyzing these claims.

Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting Graham v. Connor, 490
U.S. 386, 395 (1989)). The Court "has always been reluctant to expand the concept of
substantive due process because the guideposts for responsible decisionmaking in this
uncharted area are scarce and open-ended." Albright, 510 U.S. at 271-272.  As a consequence,
the Court has limited the availability of claims under substantive due process to those that are not
covered by the other amendments.  County of Sacramento v. Lewis, 523 U.S. 833 (1998).  The
Court has opined:

> Graham simply requires that if a constitutional claim is covered by a specific
> constitutional provision, such as the Fourth or Eighth Amendment, the claim must
> be analyzed under the standard appropriate to that specific provision and not
> under the rubric of substantive due process.

County of Sacramento, 523 U.S. at 843.   The genesis of the harm for which plaintiff seeks
redress arises from her arrest and the filing of a criminal complaint pursuant to the grand jury
presentment.  The Fourth Amendment provides the explicit textual source for protection against
the allegedly improper government behavior and therefore plaintiff cannot rely on her own
amorphous notions of the reach of the due process clause under the Fourteenth Amendment.

for summary judgment will get granted.  An appropriate order will follow.

Date: March 22, 2013

s/David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Timothy P. O'Brien, Esquire
Richard P. Joseph, Esquire
Michael E. Kennedy, Esquire
Bryan Campbell, Esquire

(*Via CM/ECF Electronic Mail*)